**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

LEIGH ANN MIDGETT,
MATTHEW LOESLEIN,
KELLIE KOEDEL,
ANDREA SEITH, and
BENJAMIN STECKER,

      Plaintiffs,

v.

DENVER C.A.R.E.S., a behavioral health facility operated by Denver Health Medical
Center/Denver Health and Hospital Authority,
PATRICIA A. GABOW, M.D.,
AUDREY VINCENT, RN, FACHE,
MARITES DILAG, RN,
KAA BENTON,
JAHARRI ASTEN,
PAUL ROSE,
NICHOLAS MAINARDI,
AVA WALSTON,
SARAH JENKINS,
ALICIA PORTILLO,
JENNIFER GARNER,
JOHN DOE #1,
JOHN DOE #2,
JOHN DOE #3,
JOHN DOE #4,
JOHN DOE #5,
JOHN DOE #6, and
JOHN DOE #7,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiffs, Leigh Ann Midgett, Matthew Loeslein, Kellie Koedel, Andrea Seith, and Benjamin Stecker, by and through their counsel, LEVIN SITCOFF PC, for their Complaint and Jury Demand against Defendants Denver C.A.R.E.S.; Patricia A. Gabow, M.D.; Audrey Vincent, RN, FACHE; Marites Dilag, RN; Kaa Benton; Jaharri Asten; Paul Rose; Nicholas Mainardi; Ava Walston; Sarah Jenkins; Alicia Portillo; Jennifer Garner; and John Does #1-4, state and allege as follows:

## INTRODUCTION

Denver C.A.R.E.S. ("Denver CARES") is a detention center masquerading as a community behavioral health facility. It is operated by the Denver Health and Hospital Authority ("DHHA") and houses, among other programs, a community detoxification ("detox") program that purports to provide "non-medical, clinically managed detoxification from alcohol and drugs in a clean and safe environment." In reality, Denver CARES uses the detox program to unlawfully detain non-consenting people who have been drinking. One of Denver CARES' motivations in operating its detox program in such a way is to make a profit.

The only lawful authority that would permit Denver CARES to hold a person against his will for detoxification is Colorado's Emergency Commitment Statute, § 27-81-111, C.R.S., which permits "protective custody" holds for intoxicated individuals *who are clearly a danger to themselves or others.* Yet, under the auspices of its detox program, Denver CARES has a policy and custom of detaining individuals like the Plaintiffs in this case–Leigh Ann Midgett, Matthew Loeslein, Kellie Koedel, Andrea Seith, and Benjamin Stecker–for hours at a time for mere intoxication alone, without any evidence of dangerousness. Indeed, in total contravention of the standard supplied by the Emergency Commitment Statute, Denver CARES' written detox

admission policy permits the detention of any person over the age of 18 with a blood alcohol level ("BAL") of "0.00, or greater, or with the appearance of acute intoxication from other drugs." Once taken into custody at Denver CARES, individuals like the Plaintiffs are physically unable to leave until they are discharged and released by a Denver CARES employee. Detained individuals have no say as to when they are discharged.

This case concerns Denver CARES taking individuals—who were not accused of any crime and engaged in no illegal conduct whatsoever—into custody, confiscating their personal belongings as though they were being taken into a correctional facility, and placing them in a locked room for hours, thereby falsely imprisoning them in the Denver CARES facility. All of this happened in accordance with Denver CARES' policies and practices and was the direct consequence of Denver CARES' operations model. It also all happened for profit. Plaintiffs are not uniquely situated and are only a few of many who have been victimized by Denver CARES' flagrant disregard of the law.

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Leigh Ann Midgett is a resident of Raleigh, North Carolina.

2.     Plaintiff Matthew Loeslein is a resident of Philadelphia, Pennsylvania.

3.     Plaintiff Kellie Koedel is a resident of Denver, Colorado.

4.     Plaintiff Andrea Seith is a resident of Denver, Colorado.

5.     Plaintiff Benjamin Stecker is a resident of Denver, Colorado.

6.     Defendant Denver CARES is a behavioral health facility operated by the DHHA. The facility operated by Denver CARES is located at 1155 Cherokee Street. Denver CARES is a subsidiary of DHHA,  political subdivision of the State of Colorado.

7.     Defendant Patricia A. Gabow, M.D. was formerly the Chief Executive Officer of the DHHA. In that role, Defendant Gabow was responsible for, among other things, implementing and enforcing DHHA and Denver CARES' policies, practices, and customs. Defendant Gabow is sued in her individual and official capacities.

8.     Defendant Audrey Vincent is the Administrative Director of Denver CARES. In that role, Defendant Vincent is responsible for, among other things, implementing and enforcing Denver CARES' policies, practices, and customs. Defendant Vincent is sued in her individual and official capacities.

9.     Defendant Marites Dilag, RN is the Nurse Manager of Denver CARES. In that role, Defendant Dilag is responsible for, among other things, implementing and enforcing Denver CARES' policies, practices, and customs. Defendant Dilag is sued in her individual and official capacities.

10.     Defendant Kaa Benton is an employee of Denver CARES. Defendant Benton is sued in his individual capacity.

11.     Defendant Jaharri Asten is an employee of Denver CARES. Defendant Asten is sued in his individual capacity.

12.     Defendant Paul Rose is an employee of Denver CARES. Defendant Rose is sued in his individual capacity.

13.     Defendant Nicholas Mainardi is an employee of Denver CARES. Defendant Mainardi is sued in his individual capacity.

14.     Defendant Ava Walston is an employee of Denver CARES. Defendant Walston is sued in her individual capacity.

15.    Defendant Sarah Jenkins is an employee of Denver CARES. Defendant Jenkins is sued in her individual capacity.

16.    Defendant Alicia Portillo is an employee of Denver CARES. Defendant Portillo is sued in her individual capacity.

17.    Defendant Jennifer Garner is an employee of Denver CARES. Defendant Garner is sued in her individual capacity.

18.    Defendants John Does #1-7 are employees of Denver CARES. Defendants Does #1-7 are sued in their individual capacities.

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 & 1343.

20.    The Court has personal jurisdiction over each Defendant under Fed. R. Civ. P. 4(k)(1).

21.    Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiffs' claims occurred within the District of Colorado.

## ALLEGATIONS REGARDING THE DENVER CARES EXPERIENCE AND DENVER CARES' POLICIES, CUSTOMS, AND PROCEDURES

**A.    Transportation to the Denver CARES Facility.**

22.    People may arrive to Denver CARES by various means.

23.    Many people are brought to detox by the Denver CARES Emergency Service Patrol ("ESP"), which roves the City of Denver exclusively for the purpose of picking up intoxicated individuals and transporting them to Denver CARES. The ESP responds to calls from law enforcement, emergency departments, or other third-parties, or locates individuals itself to take to Denver CARES.

24.     Others are brought to Denver CARES by law enforcement officers. In some instances, transport is by paddywagon from crowded venues like Mile High Stadium, and in other cases, by individual police vehicle transport.

25.     Denver CARES also accepts individuals as voluntary admittees, though, on information and belief, this group forms a negligible segment of the overall population of Denver CARES detainees.

26.     Denver CARES detainees arrive to the facility via a driveway on the side of the Denver CARES building, and enter through a set of sliding doors:



27.     Posted on the outside of these sliding doors, visible to all entrants, is a sign that reads:



28.     Immediately after entering through the sliding doors, one sees what appear to be jail cells:



26. After seeing a sign that reads, "if you are under the influence of alcohol or drugs, you will stay," and with jail cells directly in sight, a security officer confiscates a new detainee's personal property, including his wallet, keys, and cell phone. A property inventory form is completed that documents the items confiscated.

**B.    Intake at Denver CARES.**

29.    All individuals who arrive at Denver CARES for ostensible admission to the detox program are subjected to a standardized admission process.

30.    Denver CARES' written policy identifies admission criteria as follows:

  a.     18 years or older;

  b.     With a BAL of .000 or greater, or with the appearance (based on nursing assessment) of acute intoxication from other drugs;

  c.     In any stage of mild to moderate withdrawal from alcohol and/or other drugs (persons exhibiting severe withdrawal symptoms will be referred to the emergency room);

  d.     Asking for assistance with admission to a drug and/or alcohol treatment program;

  e.     Secondary to involuntary commitment under the Alcoholism and Drug Law.[1]

31.    The criteria identified in paragraphs 9(b)-(e), above, are disjunctive, *i.e.*, satisfaction of any one of them will result in detention the Denver CARES detox facility (but all detainees must be over the age of 18).

---

[1] Critically, "involuntary commitment" is something different than "emergency commitment," and requires a court order. § 27-81-112, C.R.S.

32.     None of the criteria for admission to Denver CARES detox is evidence of a person's dangerousness.

33.     Denver CARES' policy also provides that "[p]ersons presenting as sober and not wishing assistance with placement in a treatment facility will be evaluated for current medical needs and released as a 'Detox Encounter' if appropriate." In that instance, a "[n]urse will document clinical assessment at time of encounter."

34.     Thus, Denver CARES' policy is that any non-sober-presenting adult, consenting or not, can and will be admitted to the detox program. Only someone who "presents" as sober *and* is given permission by a Denver CARES nurse is even theoretically permitted to leave once brought there.

35.     Defendants Gabow and Dilag are responsible for the content, implementation, and enforcement of the Denver CARES admissions policy.

36.     After a security guard has confiscated all of an individual's personal belongings, a behavioral health technician ("Tech") approaches the person with a handheld breathalyzer and orders him to blow into it to obtain a BAL reading.

37.     Once the prospective detainee's BAL is obtained, he is escorted to an intake area where a Tech or nurse takes his vitals and obtains relevant medical history:



38.     The Tech completes the first page of a document called a "Service Plan." That document identifies the date and time of admission, the "referral source" for the admission (self, ESP, DPD/DSD, emergency department, "PES," or other), indicia of intoxication, "problems," and "goals." Sample Admissions Packet, at 6, attached hereto as **Exhibit 1**.

39.     With respect to the "problems" and "goals," **<u>pre-printed</u>** on every Service Plan is: "Problem 1 – Alcohol or drug intoxication or experiencing withdrawal from alcohol and/or drug use" and "Goal 1 – Detoxification and stabilization of vital signs." *Id.* Under "Goal 1," there are lines for documentation of "objective methods." *Id.* On information and belief, Denver CARES staff write "safe and humane detox" in this objective methods section on virtually every Service Plan they complete.

40.     The "Problem 2" area of the Service Plan also permits documentation of medical and/or psychiatric condition(s) claimed or observed. *Id.* Under this section, there is an area to document whether the detainee is homeless or not. *Id.*

41.     In addition to the Service Plan, during the admissions process, a Denver CARES staff person completes a "Severity of Ethanol Withdrawal Scale" ("SEWS") form, used to assess risk factors associated with alcohol withdrawal. *Id.* at 8.

42.     The admissions packet contains a medical consent-for-treatment ("Consent") form, the same one that is presented to any DHHA patient before receiving medical care. *Id.* at 11-12.

43.     Though Denver CARES expressly asks detainees to consent to being "treated" through the detox program, whether someone provides consent is irrelevant to whether he is actually admitted.

44.     In fact, Denver CARES does not always even ask for consent prior to admission. For example, if the detainee is too intoxicated, the staff member completing the admission skips the Consent form altogether. When Denver CARES staff elect not to discuss the Consent form during the admission process, it is presented to the detainee at the time of discharge.

45.     What's more, even if a detainee refuses to consent to admission, he is admitted anyway. In that circumstance, staff mark "refused" on the signature line of the Consent form and proceed with the admission as usual.

46.     A detainee who refuses to sign the Consent form is still not allowed to leave the facility unless a Denver CARES staff member permits it.

**C.**     **Denver CARES Detox Admission is Not Pursuant to the Emergency Commitment Statute.**

47.     Under the Emergency Commitment Statute, § 27-81-111, C.R.S., Denver CARES may only admit or hold persons against their will if they are both a) under the influence of or incapacitated by drugs or alcohol, *and* b) clearly dangerous to the health and safety of himself, herself or others.

48.     Thus, unless both of the aforementioned criteria are met, admission to and remaining at Denver CARES must be, by law, voluntary.

49.     Denver CARES **does not**, in the ordinary course, rely on the Emergency Commitment Statute as a basis for admission to the detox program. Rather, Denver CARES initially treats all admissions as voluntary.

50.     The Emergency Commitment Statute also requires that, as soon as the criteria identified in Paragraph 42, above, no longer exist, a person must be released from commitment.

51.     Denver CARES requires that anyone admitted remain in the detox facility until they are completely sober, *i.e.*, have a BAL of .000, without consideration for dangerousness or whether they are still legally intoxicated.

52.     Finally, the Emergency Commitment Statute requires substantial due process, including written notification of the basis for commitment, access to a lawyer, and a right to petition the court for a determination as to whether statutory criteria for commitment have been satisfied.

53.     Denver CARES does not provide any written notice to a detainee upon his admission to the detox program nor is there any mechanism by which a detainee could seek judicial (or any other neutral) review of his admission.

54. As Denver CARES does not rely on the Emergency Commitment Statute as a basis for admissions to its detox program, it contends, as it must, that admissions to the program are always voluntary.

**D.  Individuals Detained at Denver CARES Are Not Free to Leave.**

55. During the admission process, Denver CARES staff calculate a detainee's "estimated sober time" ("EST"), *i.e.*, the time at which he will blow .000 on a breathalyzer test and be permitted to leave the facility.

56. Different staff members have different ways of calculating EST—for example, some staff members divide the detainee's initial BAL by two, convert that number to hours (.24 BAL divided by 2 is .12 = 12 hours), then add that number to the time of admission to identify EST. In any case, EST is calculated without consideration of basic variables including gender, body weight, medications, and so forth.

57. Once a detainee's EST is calculated, he is escorted to a dormitory to wait until **at least** his EST before being permitted to leave.

58. Males are taken to the male dormitory, which is locked at all times and requires a DHHA employee swipe card to enter and exit:



59.     Females are taken to the female dormitory, which is locked at all times and requires a DHHA employee swipe card to enter and exit:



60.     The dormitories are uncomfortable. They are kept at cold temperatures, but only one blanket is afforded to each detainee. The dormitories also have televisions that play reality television shows and similar programming at a loud volume regardless of the time of day.

61.     Each detainee is assigned a cot in the dormitory.

62.     At the front of each dormitory there is a single staff person who monitors the activity in the room and who is ostensibly available to answer questions.

63.     The desk attendant has no authority to effectuate a detainee's discharge from Denver CARES.

64.     The desk attendant does have authority to request a detainee's placement in a "quiet room."

**E.     The Euphemistically Named "Quiet Rooms."**

65.     For disruptive behavior, a Denver CARES detainee will be placed in a "quiet room," which is one of the apparent jail cells at the front of the facility (there are additional quiet rooms in the hallway behind the cells immediately visible from the front entrance):



66.     Quiet rooms mimic jail cells. Some of the quiet rooms are like solitary confinement cells, and only hold one person, and others are like intake tanks, designed to hold multiple people:



67.     Placement in a quiet room can happen contemporaneously with admission or after a detainee has been placed in a dorm.

68.     Contesting admission or asking to leave the Denver CARES facility can serve as a basis for placement in a quiet room.

69.     Other bases for placement in a quiet room are disorientation, agitation/hyperactivity, being loud or verbally abusive, being physically combative/combative/threatening, medical observation, or safety. Sample Quiet Room Record, at 1, attached hereto as **Exhibit 2**.

70.     Removal from a quiet room is at Denver CARES' staff's discretion.

71.     In many cases, but not always, once someone is placed in a quiet room, Denver CARES invokes the Emergency Commitment Statute and completes an emergency commitment form.

72.     Even if a person is placed in a quiet room and emergently committed contemporaneous to his admission to Denver CARES, the emergency commitment process is separate from and follows the admission process. The emergency commitment is **not** the basis for detention at Denver CARES in the first place.

73.     Even if placement in a quiet room triggers an emergency commitment, Denver CARES does not adhere to the protocol mandated in the Statute, including provision of written notice of the basis for the emergency commitment, access to a lawyer, or the right to petition a court for release.

74.     If and when someone is released from a quiet room, his emergency commitment is terminated and, so long as he has not yet reached the pre-determined EST or has not demonstrated sobriety with a .000 BAL as read by a breathalyzer, he is placed in a dormitory and his Denver CARES detention continues.

75.     Defendant Gabow is responsible for the content, implementation, and enforcement of the DHHA Emergency Commitments policy effective beginning April 8, 2014, to an unknown date.

76.     Defendants Vincent and Dilag are responsible for the content, implementation, and enforcement of Denver CARES Recommended Practice: Guidelines for Assignment to and Care of Clients in a Quiet Room.

77.     Defendant Vincent is also responsible for the content, implementation, and enforcement of Denver CARES Recommended Practice: Nursing Guidelines for Care of Clients Requiring Physical Interventional for Aggressive Behavior.

78.     Defendant Dilag created, with others, the Denver CARES Algorithm for Emergency Commitment (EC).

**F.      The Denver CARES Discharge Process**

79.     No sooner than two hours prior to a detainee's EST, and in many cases after the EST has passed or after the detainee has already produced a .000 breathalyzer reading, Denver CARES will initiate the discharge process.

80.     Detainees **<u>cannot</u>** leave, both pursuant to Denver CARES' policy and by virtue of their being kept in a locked room, until they complete the discharge process.

81.      When it is time for a detainee to begin the discharge process, he is taken to a counselor's office located inside the dormitory:



82.     During the "counseling" session, a Certified Addiction Counselor ("CAC") probes the detainee on his employment, income, mental health, substance use, and sex life. **Exhibit 1** at 1-5, 9-10, 15-21, 24-25.

83.     The CAC then refers the detainee to a substance abuse program, regardless of whether the detainee has a substance abuse problem or whether he is seeking treatment.

84.     The CAC documents in all discharge paperwork that the detainee suffers from substance abuse. Unless the detainee himself agrees with that determination, it is made exclusively on the basis that the person was brought to Denver CARES on that single occasion.

85.     The information that the CAC documents in the discharge paperwork is input into a database that tracks substance abuse data in the State of Colorado. That information is transmitted to agencies that provide funding to Denver CARES, including the Colorado Department of Behavioral Health.

86.     After the forced "counseling" session, the CAC takes the detainee back to the intake area, where he retrieves his personal belongings and is taken to a payment window:



**F.**      **Denver CARES' Revenue Generation From Detox Detentions.**

87.      Denver CARES makes money from its detox program.

88.      First, it obtains funding from the DHHA.

89.      It also obtains funding from various state and local government agencies, some of whom have expressed concern in the past about Denver CARES' lack of accountability for its revenue stream.

90.      A non-profit organization called Signal Behavioral Health, which manages and distributes Colorado Department of Behavioral Health money to various service providers throughout the state, also gives Denver CARES money.

91.      Denver CARES relies on the information it obtains through the discharge process, including its designation of detainees as substance abusers, to obtain funding from these various sources.

92.      Even though Denver CARES obtains substantial government funding, detainees are charged for their detentions upon discharge, approximately $325 per day.

93.      In order to encourage people to pay the fee for their detention, Denver CARES offers a deal to those who pay immediately. The offer of the day is posted on a whiteboard in the payment office:



94.    If a detainee opts not to pay, the bill is processed through the DHHA's ordinary collections process. First, a bill collections representative from the hospital itself attempts to collect payment. If the person does not pay the bill—even if because he believes he was unlawfully detained—the hospital refers the bill to an external collections agency, subjecting the Denver CARES detainee to negative credit reporting and bill collection attempts.

95.    Denver CARES does not collect health insurance information from detainees, nor will it bill a detainee's health insurance for the Denver CARES detox detention.

96.    On information and belief, Denver CARES does not report the amount of money it receives from individual detox detainees to those agencies from whom it receives funding. Rather, Denver CARES requests and receives funding based upon an estimated number of people who will pass through the facility in a given funding period, without regard for whether it will recoup any money from those people themselves.

**ALLEGATIONS REGARDING PLAINTIFFS' DENVER CARES EXPERIENCES**

97.     Plaintiffs were each detained at Denver CARES. Their experiences accord with, were pursuant to, and confirm the existence of the policies, customs, and procedures described above.

**A.     Ms. Midgett Was Taken to Denver CARES From Red Rocks Amphitheatre and Detained for Eleven Hours, Even With Assistance and Advocacy From Her Lawyer Husband.**

98.     In September 2017, Ms. Midgett and her husband, Jamie, a criminal defense attorney barred in North Carolina, were visiting Colorado from their home in North Carolina to celebrate their tenth wedding anniversary. On September 23, 2017, the two attended a concert at Red Rocks Amphitheater ("Red Rocks") in Morrison, Colorado.

99.     In order to travel safely to and from the concert, Ms. Midgett and her husband traveled to Red Rocks in a ticketed shuttle bus.

100.     At the concert, they lawfully consumed alcohol that they purchased from vendors at Red Rocks who are licensed by, and generate a profit for, the City and County of Denver.

101.     During the concert, Ms. Midgett went to the restroom. Ms. Midgett had trouble finding her seat again when she returned from the restroom. She asked a Denver Police Department ("DPD") officer for assistance.

102.     Instead of helping Ms. Midgett to her seat, the officer detained her, placed her in a squad car, and drove her to the Denver CARES facility, which is 45 minutes away from Red Rocks in downtown Denver, Colorado.

103.     After Ms. Midgett failed to return from the bathroom, her husband grew worried. He checked his phone and saw that he had received a text from a DPD officer saying that the

officer "had [his] wife" and was taking her with him. The text did not indicate where the officer was taking Ms. Midgett

104.     After trying to call the officer multiple times, Jamie knocked on the window of a police cruiser at Red Rocks and explained that an officer had taken his wife, but Jamie did not know where. The officer put his head in his hands and groaned something to the effect of "Oh no, I bet they took her to Denver CARES."

105.     After finding out this information, Jamie was forced to remain at Red Rocks until the end of the concert because he was reliant on the shuttle to take him back down to Denver.

106.     Meanwhile, Ms. Midgett was admitted to Denver CARES pursuant to the ordinary admissions protocol described above. Specifically, staff confiscated Ms. Midgett's personal property, took her BAL, and completed a "Service Plan."

107.     Ms. Midgett's BAL was identified as .144 as of 10:35 p.m. on September 23, 2017.

108.     As is the case with every service plan completed at Denver CARES, Ms. Midgett's "Problem 1" was identified as "[a]lcohol or drug intoxication or experiencing withdrawal from alcohol and/or drug use." "Goal 1" was "[d]etoxification and stabilization of vital signs." The Service Plan indicates that Ms. Midgett's EST was 5:30 a.m. the next day, September 24, 2017.

109.     The completed Service Plan reflects that Ms. Midgett's skin was normal, warm, and dry; that she was able to walk alone; that her behavior/mood was calm and cooperative; and that she was oriented to person, place, and time.

110.     Ms. Midgett's score on the SEWS form indicates that she was experiencing mild withdrawal because her diastolic blood pressure was 94, instead of less than or equal to 90.

111.    At 12:47 a.m. on September 24, 2017, Ms. Midgett's SEWS score went down to 0, indicating she was experiencing no withdrawal symptoms whatsoever.

112.    Yet at 10:40 p.m. on September 23, 2017 Defendant Benton and Defendant Portillo signed off on the completed Service Plan, thereby personally participating in causing Ms. Midgett's detention at the Denver CARES facility.

113.    In accordance with Denver CARES policies and customs, Denver CARES staff told Ms. Midgett that she was being detained for her level of intoxication and that she was not free to leave until she blew .000 BAL on a breathalyzer test.

114.    When Ms. Midgett was placed in the dormitory—a room that, of course, she could not get out of on her own—she used the phone located there to call Jamie. She explained to him that she was being held at Denver CARES and had been told she could not leave before her EST, which was 5:30 a.m.

115.    Jamie advised Ms. Midgett to calmly and respectfully request to leave. Ms. Midgett repeatedly did that, and was repeatedly told by multiple Denver CARES staff members that she could not leave.

116.    When Jamie arrived at Denver CARES, he explained that his wife was being detained at the facility and asked that she be released immediately. In response, Denver CARES staff asked whether Jamie himself had been drinking and attempted to breathalyze him. Having seen the sign on the door that said that if he had been drinking, he would "stay" at Denver CARES, Jamie left Denver CARES without saying anything further.

117.    Upon returning to his hotel room, Jamie researched Denver CARES and came across a copy of the complaint filed in a lawsuit styled *Michael Cornell, et al. v. Denver CARES,*

*et al.*, U.S.D.C. D. Colo. Civil Action No. 16-cv-02915-PAB-KLM, which was pending at the time. Through the allegations in that complaint, Jamie familiarized himself with relevant Colorado law regarding emergency commitments for alcohol intoxication.

118.     While away from Denver CARES, Jamie remained in contact with Ms. Midgett and continued to advise her to calmly and respectfully request to leave the facility.

119.     Ms. Midgett did continue to calmly and respectfully request to leave, but was again repeatedly denied.

120.     In the early morning hours, Jamie returned to Denver CARES and once again demanded that his wife be released. Multiple Denver CARES staff reaffirmed that Ms. Midgett would not be released until her EST.

121.     Jamie referenced the Emergency Commitment Statute in his conversations with the Denver CARES staff that he talked to and explained that Ms. Midgett did not satisfy the criteria for commitment. His reasoning fell on deaf ears.

122.     Jamie also mentioned that he was aware of a lawsuit alleging that Denver CARES had done to others precisely what it was doing to his wife at that very moment. Someone responded sarcastically, "which lawsuit," and the group of staff members Jamie was interacting with collectively laughed.

123.     Recognizing that there was nothing he could do to secure Ms. Midgett's release, especially not in the middle of the night, Jamie sat down and waited for Ms. Midgett to be released at Denver CARES' leisure.

124.     Though Ms. Midgett's EST had been identified as 5:30 a.m., that time came and went without Ms. Midgett being released.

125.    Denver CARES staff checked Ms. Midgett's BAL at 7:35 a.m. and obtained a reading of .018. At 8:50 a.m., Ms. Midgett's BAL registered as .000.

126.    At that point, Ms. Midgett was permitted to begin the discharge process, in a counselor's office in the female dormitory. During that process, Ms. Midgett underwent an intrusive and unwanted exit interview conducted by Defendant Walston.

127.    During the interview, Defendant Walston requested that Ms. Midgett provide significant, detailed personal information including information about her sexual activity, substance use, and mental health.

128.    Ms. Midgett, rightfully feeling intruded upon by Defendant Walston's questions, refused to participate in the exit interview.

129.    Defendant Walston and other Denver CARES staff repeatedly presented Ms. Midgett with a Consent form, which Ms. Midgett refused to sign.

130.    Finally, at 9:20 a.m. on September 24, 2017, Ms. Midgett's property was returned to her and Defendant Walston permitted Ms. Midgett to be released.

131.    When asked to pay for her detention at Denver CARES before leaving the facility, Ms. Midgett declined.

132.    At no time did Ms. Midgett receive any medical treatment at Denver CARES.

133.    After returning home, Ms. Midgett received a bill for her "treatment" at Denver CARES in the amount of $669.50, $335.75 per "day" she was detained at Denver CARES (the evening of September 23, 2017 and the early morning of September 24, 2017).

134.    Shortly thereafter, Ms. Midgett received a notice of nonpayment.

135.    As of the time of filing, Ms. Midgett has paid the entirety of the balance of her Denver CARES' bill, paid at a reduced "self-pay" rate.

**B.     Mr. Loeslein Was Detained at Denver CARES for Six Hours After the Charge Nurse Documented Him as "Ok to Discharge."**

136.    In 2017, Mr. Loeslein visited Denver from his home in Philadelphia, Pennsylvania to spend Fourth of July weekend with friends.

137.    At 2:07 a.m. on July 4, 2017, Mr. Loeslein was picked up by the Denver CARES ESP vehicle outside the Westin hotel on 16th Street in downtown Denver.

138.    The unknown Denver CARES employees operating the ESP vehicle did not test Mr. Loeslein's BAL, yet they took him to the Denver CARES detox facility, where he was admitted into the Denver CARES detox program.

139.    Upon his arrival to Denver CARES, Mr. Loeslein was admitted pursuant to the protocol described above. Specifically, staff confiscated Mr. Loeslein's personal property, took his BAL, and completed a "Service Plan."

140.    Mr. Loeslein's BAL was identified as .199 as of 2:40 a.m. on July 4, 2017.

141.    As is the case with every service plan completed at Denver CARES, Mr. Loeslein's "Problem 1" was identified as "[a]lcohol or drug intoxication or experiencing withdrawal from alcohol and/or drug use." "Goal 1" was "[d]etoxification and stabilization of vital signs." The Service Plan indicates that Mr. Loeslein's EST was 12:40 p.m. that same day.

142.    The completed Service Plan reflects that Mr. Loeslein's skin was normal, warm, and dry; that he was able to walk alone; that his behavior/mood was calm and cooperative; and that he was oriented to person, place, and time.

143.    Mr. Loeslein had a score of 0 on the SEWS form, illustrating that he was experiencing no withdrawal symptoms whatsoever.

144.    Yet at 2:45 a.m., Defendant Rose and Defendant Doe #1 signed off on the completed Service Plan, thereby personally participating in causing Mr. Loeslein's detention at the Denver CARES facility.

145.    In accordance with Denver CARES' policies and customs, Denver CARES staff told Mr. Loeslein that he was being held for his level of intoxication and that he was not free to leave until he blew .000 BAL on a breathalyzer test.

146.    Denver CARES staff confined Mr. Loeslein to the male dormitory. As is always the case, the doors to the male dorm room were locked and required a DHHA employee swipe card to enter and exit.

147.    Beginning around 7:30 a.m., Mr. Loeslein began asking that someone let him out of the dormitory and that he be permitted to leave the facility. He was repeatedly told by the attendant at the desk in the male dormitory, "I can't help you. You can't leave."

148.    Mr. Loeslein expressly advised that he did not want to be at the facility and that information was documented in a "Clinical Note" recorded in Mr. Loeslein's Denver CARES chart.

149.    According to a Clinical Note written by an unknown Denver CARES staff member, at 10:30 a.m. on July 4, 2017, Mr. Loeslein spoke with a nurse and told her that if Denver CARES did not release him, he was going to miss his flight back to Philadelphia. Mr. Loeslein also advised that he would take an Uber to his hotel and then to the airport and so would not be driving.

150.    At that time, Mr. Loeslein's mental status was documented as "coherent," "alert," and "oriented." Mr. Loeslein was stable and presented with no scent of alcohol on his breath. He had a "steady gait" and no slurred speech. Based on this information, the charge nurse on duty assessed Mr. Loeslein and determined that he was "ok to [discharge] to self/Uber."

151.    Mr. Loeslein's BAL at 10:30 a.m. on July 4, 2017 was .089.

152.    Even though the charge nurse identified Mr. Loeslein as safe to leave, he was still not permitted to do so. Defendant Doe #2 – not the nurse who had approved his release – told him that since he was going to miss his flight anyway, there was no reason to let him leave at that time.

153.    Mr. Loeslein was forced to stay in the male dormitory until at least 3:50 p.m., more than five hours after he was deemed "ok to discharge" and three hours after his EST.

154.    While he was in the dormitory, including after he was assessed as "ok" to leave, Mr. Loeslein repeatedly asked Denver CARES staff to leave but his detention continued nevertheless. Throughout his time at Denver CARES, Mr. Loeslein was polite and respectful but insistent that he did not consent to being there.

155.    At some point during his detention at Denver CARES, a staff member with the first name Kenna presented a Consent form for Mr. Loeslein to sign.

156.    Under the "patient signature" line of the form, someone wrote "Unable," though Mr. Loeslein's signature appears to be present on the line above.

157.    On information and belief, Mr. Loeslein was determined unable to sign the consent form due to his intoxicated state at the time of admission to Denver CARES, and then asked to sign the consent form during the discharge process.

158.     At approximately 3:50 p.m. on July 4, 2017, Mr. Loeslein was forced to participate in an intrusive and unwanted exit interview, consisting of questions about Mr. Loeslein's employment, income, mental health, substance use, and sex life, conducted by Defendant Mainardi. The exit interview lasted until 4:20 p.m.

159.     Finally, at approximately 4:20 p.m. on July 4, 2017, Mr. Loeslein's property was returned to him and Defendant Mainardi permitted Mr. Loeslein to be released.

160.     Before leaving Denver CARES, Mr. Loeslein was brought to the payment window in order to pay for his "treatment." When told he could pay immediately at the rate of $117.16 or be billed later at a greatly increased rate of up to $500, he decided to pay in order to end his ordeal as soon as possible.

161.     At no time did Mr. Loeslein receive any medical treatment at Denver CARES.

**C.     An Ill Ms. Koedel Was Detained in a Quiet Room Immediately Upon Arrival to Denver CARES Because She Was "Agitated" and "Not Following Directions."**

162.     On June 8, 2018, Ms. Koedel, a Denver resident, was drinking with friends in downtown Denver.

163.     Denver CARES records indicate that DPD officers brought Ms. Koedel to Denver CARES at approximately 12:10 a.m. on June 9, 2018.

164.     Upon arrival at Denver CARES, staff executed the standard protocol for Denver CARES admissions and detentions, confiscating Ms. Koedel's personal property and completing a "Service Plan."

165.     Ms. Koedel declined to take a breathalyzer test and provide a BAL upon arrival, but her BAL was identified as .226 as of 2:50 a.m. on June 9, 2018.

166.     As with all Service Plans completed at Denver CARES, Ms. Koedel's "Problem 1" was identified as "[a]lcohol or drug intoxication or experiencing withdrawal from alcohol and/or drug use." "Goal 1" was "[d]etoxification and stabilization of vital signs." The Service Plan indicates that Ms. Koedel's EST was 4:20 p.m. that same day.

167.     The completed Service Plan reflects that Ms. Koedel's skin was normal, warm, and dry; that she was able to walk alone; that her behavior/mood was anxious, agitated, irritable, and angry; and that she was oriented to person, place, and time.

168.     Furthermore, Ms. Koedel's score of 0 on the SEWS scale – though it was erroneously transcribed onto the Service Plan as a "3" – illustrates that she was experiencing no withdrawal symptoms whatsoever.

169.     Defendants Portillo and Benton signed Ms. Koedel's service plan at 4:30 and 4:35 a.m., respectively, on June 9, 2018.

170.     Rather than take Ms. Koedel to the female dormitory upon completion of the admission paperwork, Denver CARES staff placed her in a quiet room. Defendant Portillo initiated and approved Ms. Koedel's placement in a quiet room.

171.     When Ms. Koedel was taken to the quiet room, she perceived it to be a jail cell with only a cement bench and toilet visible to the staff outside the cell, without toilet paper and handwashing equipment. The cell was dirty and covered in hair, and there was a puddle of an unknown substance on the floor.

172.     In conjunction with her placement in the quiet room Defendant Portillo signed an emergency commitment form even though no grounds for emergency commitment existed. The

quiet room record documents that the reason Ms. Koedel was being emergently committed was because she was "agitated" and "[not] following directions."

173.     Even though Ms. Koedel was purportedly emergently committed, she received no written notification of the reason, and no one explained to her that she had a right to contest her commitment or provided her any meaningful opportunity to do so.

174.     At approximately 2:50 a.m. on June 9, 2018, Ms. Koedel was transferred from the quiet room to the female dormitory.

175.     When Ms. Koedel said she wanted to use the dormitory phone to call her attorney, Denver CARES staff said Ms. Koedel was being "unruly" and returned her to the quiet room.

176.     While in the quiet room, Ms. Koedel repeatedly requested to leave in order to take medications she requires for Lyme disease, without which, she warned Denver CARES staff, she was at risk for seizures. Ms. Koedel offered to provide her doctor's contact information so Denver CARES staff could verify her need for the medications, and even offered use of her cell phone to contact anyone in her address book to confirm that she did, indeed, have Lyme disease.

177.     In response, an unknown Denver CARES nurse "evaluated" Ms. Koedel's need for her medication by yelling questions through the quiet room door. This nurse then determined that Ms. Koedel did not need her medications, without ever examining her or even seeing her face to face.

178.     A second unknown Denver CARES employee agreed with the nurse's determination and stated that Ms. Koedel could not take her medications while intoxicated because alcohol renders medication ineffective. That assessment is not medically accurate.

179. Denver CARES staff refused to release Ms. Koedel from the quiet room and coldly informed her that if she had a seizure as a result of forgoing her medication, they would deal with it then.

180. At no time did Ms. Koedel receive any medical treatment at Denver CARES.

181. Moreover, prior to her detention, Ms. Koedel had injured her back and had been to an osteopath for care on June 8, 2018. Ms. Koedel told Denver CARES staff that the cement holding cell was causing further injury to her back, but she was ignored.

182. After her detention, Ms. Koedel experienced worsened back problems due to the conditions of the cell which she was forced to endure.

183. Denver CARES staff were also dismissive of Ms. Koedel's food allergies.

184. When Ms. Koedel asked to pay for or order her own food, staff told her food allergies were not real and "if she were hungry enough, she would eat" the food provided by the facility.

185. At 4:30 a.m. on June 9, 2018, over four hours after Ms. Koedel arrived and was placed in a quiet room, Defendant Portillo and Defendant Benton signed off on the completed Service Plan, thereby personally participating in causing Ms. Koedel's detention at the Denver CARES facility.

186. Because she was locked in a quiet room for most of the time between 12:10 a.m. and 9:04 a.m., Ms. Koedel was forced to use the cell's toilet – without toilet paper or hand-washing equipment – in full view of all persons walking by the quiet room window.

187. The window blinds were open and Ms. Koedel could not close them from inside the quiet room. The window is directly across from a work station where many men were working

at the time Ms. Koedel needed to use the toilet. Anyone in the area of the work station could see directly into the quiet room and the toilet area over the half wall surrounding the toilet.

188.    Despite being moved into a dormitory at approximately 9:00 a.m. on June 9, 2018, Ms. Koedel remained emergently committed until assessed by a Denver CARES staff counselor at approximately 11:00 a.m.

189.    Even when the emergency commitment was ended, Ms. Koedel was told she would be held at Denver CARES until she blew .000 on a breathalyzer exam.

190.    Nevertheless, Ms. Koedel was released to an Uber from Denver CARES at approximately 11:30 a.m. on June 9, 2018, even though her BAL was .068, contrary to Denver CARES' previous claim that policy was not to release her until she blew .000.

191.    Defendant Asten, Ms. Koedel's assigned counselor, assessed Ms. Koedel and determined that she could be released despite the fact that her BAL was not yet .000. Defendant Asten informed Ms. Koedel that since she was now "being quiet and behaving," Defendant Asten would "do [Ms. Koedel] a favor" and let her go.

192.    Defendant Asten was careful to document that Ms. Koedel would be "discharged to Uber because she is still intoxicated," but Denver CARES staff did nothing to ensure that Ms. Koedel actually took an Uber home.

193.    Instead, Ms. Koedel was permitted to walk out of the facility unsupervised. As Ms. Koedel was walking out of the facility, an unknown Denver CARES security guard attempted to shame her by asking if this would be a wake-up call to make her realize she should change her lifestyle.

194. After returning home, Ms. Koedel received a bill for her "treatment" at Denver CARES. The bill was for $334.75 that was "adjusted" by $217.59, requiring her to pay $117.16.

195. Ms. Koedel, through counsel, notified the DHHA that she disputed the charge because it resulted from her unlawful detention at Denver CARES. Even though the DHHA is aware that Ms. Koedel disputes the debt it is attempting to collect, it continues to request payment.

**D. Denver CARES Placed Ms. Seith in a Quiet Room After She was Threatened by Another Detainee, Then Refused to Allow Her to Leave, Even With a Friend.**

196. On August 11, 2018, Plaintiff Andrea Seith spent the afternoon stand-up paddleboarding with friends. Over the course of ten hours, Ms. Seith consumed five drinks, four 250ml cans of rosé and a single glass of champagne.

197. At the time, Ms. Seith was being treated with a prescription antibiotic.

198. After paddleboarding, Ms. Seith and her friends returned to a friend's house.

199. From there, Ms. Seith's friend called an Uber to drive Ms. Seith home.

200. During the ride, the Uber driver inexplicably stopped and told Ms. Seith to get out of the car. Confused, Ms. Seith did as she was asked.

201. Almost immediately after Ms. Seith's Uber ride abruptly ended, the Denver CARES ESP vehicle pulled up and Defendants Doe #3 and Doe #4 took Ms. Seith into custody.

202. Meanwhile, Ms. Seith's friend had received the notification that Ms. Seith's Uber ride had ended early. She began calling Ms. Seith's phone to find out what was going on.

203. Defendants Doe #3 and Doe #4 confiscated Ms. Seith's personal property, including her cell phone, so Ms. Seith was unable to respond to her friend's calls.

204.     Despite the fact that Ms. Seith's friend was repeatedly calling her phone, Defendants Doe #3 and Doe #4 used Ms. Seith's phone to call a different friend of hers to inquire whether he could come pick Ms. Seith up. The friend readily agreed and stated that he was approximately ten minutes away. Either Defendant Doe #3 or Doe #4 then said, "never mind, you're too far away," hung up the phone, and proceeded to transport Ms. Seith to the Denver CARES facility.

205.     Ms. Seith arrived at the Denver CARES facility extremely confused and repeatedly asked what she was doing there.

206.     Upon arrival at Denver CARES, staff executed the standard protocol for Denver CARES admissions and detentions, taking Ms. Seith's personal property from the staff driving the ESP patrol van, taking her BAL, and completing a "Service Plan."

207.     Ms. Seith's BAL was identified as .334 with a SEWS score of 0 as of 11:25 p.m. on August 11, 2018.

208.     Just like with all Service Plans, Ms. Seith's "Problem 1" was identified as "[a]lcohol or drug intoxication or experiencing withdrawal from alcohol and/or drug use." "Goal 1" was "[d]etoxification and stabilization of vital signs." The Service Plan indicates that Ms. Seith's EST was 3:55 p.m., presumably on August 12, 2018.

209.     The completed Service Plan reflects that Ms. Seith's skin was normal, warm, and dry; that she was able to walk alone; that her behavior/mood was calm and cooperative; and that she was oriented to person. Furthermore, Ms. Seith's score of 0 on the SEWS scale illustrates that she was experiencing no withdrawal symptoms whatsoever.

210.    Denver CARES staff also completed an Alcohol Withdrawal Assessment Record for Ms. Seith which reflects that she was not in withdrawal at any point during her detention at Denver CARES.

211.    Yet at 11:35 p.m. on August 11, 2018, the Defendants Doe #5 and Doe #6 signed off on Ms. Seith's Service Plan, thereby personally participating in causing Ms. Seith's detention at the Denver CARES facility.

212.    Ms. Seith was then confined to the female dormitory. As is always the case, the doors to the female dorm were locked at all times and required a DHHA employee swipe card to enter and exit.

213.    During her first hour in the dormitory, Ms. Seith repeatedly asked other detainees where she was and why she was being detained.

214.    When Ms. Seith asked a "frequent flyer" detainee—*i.e.*, someone who is regularly detained at Denver CARES—for information, the woman responded that she was going to "beat [Ms. Seith's] fucking ass if [she] didn't get away from [her]."

215.    Denver CARES staff put both Ms. Seith and the individual into separate quiet rooms at 12:15 a.m. on August 12, 2018.

216.    Ms. Seith's quiet room record states she was placed there because she was "unable to follow directions, ready to fight."

217.    Ms. Seith was not, in fact, "ready to fight." Rather she was confused and afraid of the woman who had threatened her.

218.    Nevertheless, Defendant Benton and Defendant Portillo determined that Ms. Seith would be removed to a quiet room "until cooperative."

219.    Even though no grounds for emergency commitment existed, Denver CARES staff completed, and Defendant Portillo approved, an emergency commitment form for Ms. Seith.

220.    No Denver CARES staff person notified Ms. Seith, either verbally or in writing, of her right to legally contest her confinement by Denver CARES. In fact, no one explained anything to Ms. Seith about the reasons for her placement in the quiet room, nor what she needed to do to get out.

221.    The quiet room where Ms. Seith was confined had no running water or a toilet, and the window had been covered with black paper so she could not see out.

222.    Not knowing where she was or why, Ms. Seith banged on the quiet room door and repeatedly asked for someone to explain what was going on. She was ignored.

223.    Ms. Seith endured several hours alone in the quiet room with no response from staff.

224.    Because Ms. Seith was still in her clothes from her day of paddleboarding—a swimsuit, a sheer cover up, and a sport skirt—she was extremely cold during her detention in the quiet room.

225.    Eventually, an unknown woman entered the room to take Ms. Seith's blood pressure, and said something to her to the effect of, "I told you if you were quiet, I would let you out." In fact, no one had previously said anything like that to Ms. Seith.

226.    The woman then, finally, returned Ms. Seith to the female dormitory at 4:55 a.m. on August 12, 2018. Ms. Seith was again intimidated by the other women in the room.

227.    Ms. Seith was detained in the female dormitory from 11:35 p.m. on August 11, 2018 until 12:35 a.m. on August 12, 2018, and then again from 4:55 a.m. until 5:33 p.m. when she was finally released from Denver CARES.

228.    At some point during the morning of August 12, 2018, a Denver CARES staff member remarked to Ms. Seith that her BAL was "crazy high" when she arrived at Denver CARES and that "people start going into comas if they get to that point or a little higher [BAL]." When Ms. Seith asked why, if that was so, was she was brought to Denver CARES instead of a hospital, the staff member did not respond.

229.    While in the dormitory, Ms. Seith asked the employee at the desk to see if she could have a friend come pick her up. She was told that she could "try," and that it had "happened before" but would "take some paperwork."

230.    Meanwhile, a friend of Ms. Seith's had been trying to find her by calling several locations throughout Denver, and he eventually learned that Ms. Seith was at Denver CARES. He was able to call Ms. Seith on the phone in the female dormitory.

231.    When Ms. Seith spoke with her friend, she repeated what she had been told by the staff member at the desk: that he could come get her after filling out some paperwork.

232.    However, when Ms. Seith's friend arrived, Denver CARES staff told him there was no way Ms. Seith would be permitted to leave until she blew .000.

233.    Ms. Seith's friend called her in the female dorm to tell her that he would not be permitted to pick her up, and Ms. Seith reported the same to the staff member who had told her that she could be retrieved by a friend. That person simply shrugged and said there was nothing she could do.

234.    Ms. Seith informed the woman at the desk in the female dorm that she needed to take care of her dog at home. The woman responded that there were women in Denver CARES that have kids at home alone and Denver CARES was not going to release those women either. Ms. Seith asked if she could release her keys to her friend so he could go tend to her dog. After about half an hour, she was told that she would be allowed to give her friend her keys, and Ms. Seith signed paperwork allowing her friend to take her keys out of her confiscated property.

235.    Ms. Seith laid down and tried to sleep. Staff tried to get her to go get breakfast – which was held at a location where all detainees, including the men, were present – but she was not interested and did not attend.

236.    Ms. Seith did attend lunch around noon because she was told she would get out sooner if she ate.

237.    Denver CARES staff continued to breathalyze Ms. Seith every hour or so, and they finally called the discharge counselor at 5:10 p.m. when the paperwork indicated Ms. Seith blew a BAL of .000.

238.    Ms. Seith was then forced to participate in an intrusive and unwanted exit interview conducted by Defendant Jenkins, during which Defendant Jenkins asked Ms. Seith questions about her employment, income, mental health, substance use, and sex life.

239.    In Ms. Seith's words, Defendant Jenkins "asked ridiculous questions without even looking at [her]."

240.    According to Ms. Seith's discharge paperwork, the interview began at 5:20 p.m. and concluded at 5:33 p.m., although the paperwork also notes Ms. Seith received her personal

belongings at 5:26 p.m., and Ms. Seith recalls having to wait 10-15 minutes after her exit interview to receive her property after Defendant Jenkins permitted her to be released.

241.     Before leaving Denver CARES, Ms. Seith was required to sign the exit interview questionnaires, a Disclosure and Confidentiality Statement form, and a Consent for the Release of Confidential Alcohol or Drug Treatment Information form.

242.     Ms. Seith did not sign, either at admission or discharge, the Hospital General Consent for Treatment and Terms Relating to Payment.

243.     At no time did Ms. Seith receive any medical treatment at Denver CARES.

244.     Denver CARES staff informed Ms. Seith that she could pay a discounted fee prior to leaving or she would be billed $350 for her treatment. Ms. Seith declined to pay for her detention.

245.     On August 19, 2018, Ms. Seith received a bill for $900 that was "adjusted" by $585, requiring her to pay $315.

246.     Ms. Seith, through counsel, notified the DHHA that she disputed the charge because it resulted from her unlawful detention at Denver CARES. Even though the DHHA was aware that Ms. Seith disputed the debt it was attempting to collect, it referred that debt to an outside collections agency.

### E.     Mr. Stecker was Taken From His Own Home to Denver CARES and Detained There for Five and a Half Hours Even Though He Was Sober.

247.     On February 26, 2018, Mr. Stecker and his wife attended a birthday party where they both lawfully consumed alcohol.

248.     Upon returning home, Mr. and Mrs. Stecker got into an argument, which apparently prompted one of their neighbors to call the police.

249.    At approximately 1:00 a.m. on February 27, 2018, two DPD officers arrived at the Steckers' home in downtown Denver. Mr. Stecker opened the door, explained the situation, and informed the officers that he and his wife would be quieter. Nonetheless, the officers began questioning Mr. Stecker regarding his intoxication and asked that he step outside his home to speak with them.

250.    Mr. Stecker is a United States Army veteran with a good understanding of his civil liberties. As such, he politely declined to step outside his home.

251.    The DPD officers then forcibly removed Mr. Stecker from his home, handcuffed him, and forced him to sit on the curb, all without shoes or a jacket.

252.    Apparently enraged with Mr. Stecker's "non-cooperation," one of the officers repeatedly shouted that they were going to arrest him. When Mr. Stecker inquired as to the charges, neither officer could provide a substantive answer.

253.    Meanwhile, Mrs. Stecker exited the house in tears, pleading with the officers to release her husband and leave them alone.

254.    Instead, the officers roughly shoved Mr. Stecker into a patrol car, told him to "shut the fuck up" when he requested a seatbelt, and transported him to the Denver CARES facility.

255.    Upon arrival at Denver CARES, staff executed the standard protocol for Denver CARES admissions and detentions, confiscating Mr. Stecker's personal property and completing a "Service Plan."

256.    When facility staff asked Mr. Stecker if they could take his vitals, Mr. Stecker initially refused. Staff informed him that if he did not consent to having his vitals taken, he would be placed in a quiet room.

257.    Facing confinement to a quiet room, Mr. Stecker consented to having his vitals taken. His BAL was identified as .027 sometime between 1:30 and 1:50 a.m.

258.    Despite the low level of alcohol present in Mr. Stecker's system, Denver CARES staff continued with Mr. Stecker's admission to the facility.

259.    Staff completed a Service Plan, which, as usual, identified Mr. Stecker's "Problem 1" as "[a]lcohol or drug intoxication or experiencing withdrawal from alcohol and/or drug use." "Goal 1" was "[d]etoxification and stabilization of vital signs." The Service Plan indicates that Mr. Stecker's EST was 3:00 a.m. that same day.

260.    The completed Service Plan reflects that Mr. Stecker's skin was normal, warm, and dry; that Mr. Stecker was able to walk alone; that Mr. Stecker's behavior/mood was calm and cooperative; and that Mr. Stecker was oriented to person, place, and time.

261.    Denver CARES staff documented that Mr. Stecker had a score of "3" on the SEWS because his diastolic blood pressure was 96 instead of equal to or lower than 90.

262.    Nevertheless, at 1:50 a.m., Defendant Rose and Defendant Doe #7 signed off on the completed Service Plan, thereby personally participating in causing Mr. Stecker's detention at the Denver CARES facility.

263.    In accordance with Denver CARES policies and practices, Denver CARES staff told Mr. Stecker that he was being detained for his level of intoxication and that he was not free to leave until he blew .000 BAL on a breathalyzer test.

264.    Denver CARES staff confined Mr. Stecker to the male dormitory. As is always the case, the doors to the male dorm room were locked at all times and required a DHHA employee swipe card to enter and exit.

265.    At 3:20 a.m., twenty minutes after his EST, Denver CARES staff checked Mr. Stecker's BAL. Unsurprisingly, it was .000.

266.    Yet, Denver CARES held Mr. Stecker for nearly another three hours, until 6:10 a.m.

267.    After being taken to the dormitory, Mr. Stecker began to experience the symptoms of an anxiety attack resulting from the trauma of being detained, unable to leave, in a room full of intoxicated people.

268.    Being confined to a dormitory full of intoxicated people was especially traumatic for Mr. Stecker due to his family history of alcoholism.

269.    Mr. Stecker's father was an alcoholic. As a child, Mr. Stecker frequently witnessed his father's intoxication and subsequent vomiting.

270.    Mr. Stecker requested various forms of relief for his anxiety, including confinement in a quiet room, all of which were summarily denied by Denver CARES staff.

271.    Denver CARES staff told Mr. Stecker he could not go to a quiet room without being "committed" and kept there for twelve hours.

272.    When Mr. Stecker begged to go to the hospital, facility staff denied his request and told him to "go ahead and scream; do whatever you want, but you're not getting out."

273.    When Mr. Stecker asked why he was being detained past his EST and past the time when he was demonstrably sober, Denver CARES staff provided various unsatisfactory explanations.

274.    First, it was because no counselor came when called and staff didn't know when one would be available.

275.    Then, it was because the police had instructed Denver CARES staff that Mr. Stecker could not return to his home until 6:00 a.m.

276.    When Mr. Stecker then asked if he could be released to go somewhere other than his residence, the reason Denver CARES provided for Mr. Stecker's detention was that a counselor wouldn't be available until 6:00 a.m., and the absence of his shoes and jacket demonstrated he was not fit to leave the facility. This was notwithstanding the fact that he had been involuntarily brought to the facility in that condition by the police.

277.    While Mr. Stecker was detained in the dormitory, he repeatedly asked Denver CARES staff to leave but was prohibited from doing so. Throughout his time at Denver CARES, Mr. Stecker was polite and respectful but insistent that he did not consent to being there.

278.    By the time he finally met with Defendant Garner, who conducted Mr. Stecker's exit interview, Mr. Stecker was in tears.

279.    Defendant Garner was sympathetic and did not ask Mr. Stecker the typical discharge questions regarding drugs and alcohol. She instead asked him about his emotional state.

280.    Mr. Stecker told her that he had never experienced such a negative emotional state outside of his time in the military.

281.    Defendant Garner agreed that Mr. Stecker's experience had been terrible and suggested Mr. Stecker contact a patient representative and a lawyer.

282.    Defendant Garner then took Mr. Stecker to retrieve his personal property.

283.    Mr. Stecker was told he would be billed for his detention. Defendant Garner warned Mr. Stecker that Denver CARES would come after him should he refuse to pay.

284.     Mr. Stecker was twice asked to sign a document related to payment. He declined both times.

285.     At no time did Mr. Stecker receive any medical treatment at Denver CARES.

286.     When Defendant Garner finally permitted him to be released, Mr. Stecker called a friend who then ordered him an Uber home.

287.     After returning home, Mr. Stecker received a bill for his "treatment" at Denver CARES. The bill was for $334.75 that was "adjusted" by $217.59, requiring him to pay $117.16.

288.     Mr. Stecker notified the DHHA that he disputed the charge because it resulted from his unlawful detention at Denver CARES. Even though the DHHA was aware that Mr. Stecker disputed the debt it was attempting to collect, it referred that debt to an outside collections agency.

289.     Mr. Stecker was unaware that his disputed bill had been referred to a collections agency until recently, when he purchased a vehicle and then learned his credit had been adversely affected.

### CLAIM ONE – Unlawful Seizure of Person in Violation of the Fourth and Fourteenth Amendments to the United States Constitution

### (All Plaintiffs Against All Defendants)

290.     Plaintiffs hereby reallege and restate paragraphs 1-287, above.

291.     At the time of their detentions at Denver CARES, under the United States Constitution, each Plaintiff had a Fourth Amendment right, incorporated by the Fourteenth Amendment, against non-consensual detention without probable cause to believe that each Plaintiff was both intoxicated and clearly a danger to himself or others.

292.    As described herein, each Plaintiff demonstrably did not consent to being seized or detained at the Denver CARES facility. All Plaintiffs expressed a desire to leave the facility and were physically prevented from doing so by Denver CARES staff.

293.    Denver CARES did not purport to establish—because it could not—that there was probable cause to detain any Plaintiff at Denver CARES, *i.e.*, probable cause to believe that each Plaintiff was both intoxicated and clearly a danger to himself or others.

294.    The reason that Denver CARES seized and detained each Plaintiff without probable cause is because Denver CARES' written policy does not require that there exist such probable cause before a person is detained in the detox program.

295.    Instead, Denver CARES' written policy instructs that Denver CARES can and should detain any adult who does not appear sober and has a BAL of 0.00 or higher. This instruction operates as an instruction to Denver CARES employees to conduct unreasonable seizures in violation of the Fourth Amendment.

296.    The standard identified in this written policy is a standard well-below that which is required by the Fourth Amendment.

297.    Thus, Denver CARES' written policy allowing and instructing admission to the Denver CARES detox program without regard for a detainee's dangerousness was the moving force behind each Plaintiff's detention in the facility.

298.    Irrespective of Denver CARES' written policy, the custom at Denver CARES is to detain intoxicated, or even sober, individuals without regard for their dangerousness.

299.    As the sign on the entry doors to the detox facility instructs, "if you are under the influence of alcohol or drugs, you will stay."

300.    Denver CARES' custom is also to hold detainees well beyond the time that probable cause supporting their detentions could have even arguably existed. Specifically, Denver CARES requires, as a general matter, that a detainee be completely sober before being released.

301.    Denver CARES' unwritten release policy, just like its admission policy, gives no regard to a detainee's dangerousness. Nor does it account for whether a detainee is legally intoxicated.

302.     Denver CARES' unwritten custom regarding admission and release, in that it causes detentions of individuals who are not legally intoxicated and/or not clearly a danger to themselves or others, was the moving force behind each Plaintiff's detention at Denver CARES.

303.    Denver CARES, a municipality for the purposes of 42 U.S.C. § 1983, is liable to Plaintiffs for implementing a written policy and an informal custom of detaining individuals without probable cause to believe they are both intoxicated and clearly a danger to themselves or others. Plaintiffs are entitled to compensatory damages in amounts to be determined by a jury for Denver CARES' conduct in this respect.

304.    Defendants Gabow, Vincent, and Dilag are liable to Plaintiffs for causing the implementation and enforcement of Denver CARES' written policy that instructs staff members to detain people without sufficient probable cause.

305.    Defendants Gabow, Vincent, and Dilag's conduct is exacerbated by their willful disregard of clearly established law requiring probable cause incident to an alcohol-related detention.

306.    It is further exacerbated by their plainly pretextual contention that Denver CARES detainees admit themselves to detox voluntarily, a contention that is belied by the custodial

transportation methods used to get people to the facility, the jail-like protocols enforced during the admission process, and the physical lock-up that occurs once a person has been admitted.

307.   Finally, Defendants Gabow, Vincent, and Dilag's conduct is extraordinarily callous in that Denver CARES' detentions are effectuated for revenue.

308.   Consequently, Plaintiffs are entitled to punitive damages in amounts to be determined by a jury from Defendants Gabow, Vincent, and Dilag.

309.   In addition, Plaintiffs are entitled to an injunction ordering Denver CARES to end its policy and custom of detaining people without probable cause to believe they are both intoxicated and clearly a danger to themselves or others.

310.   Pursuant to Denver CARES' policy and custom of unlawfully detaining people without probable cause to believe they are intoxicated and clearly a danger to themselves or others, Defendants Benton, Asten, Rose, Mainardi, Walston, Jenkins, Portillo, Garner, and Does 1-4 violated Plaintiffs right against unreasonable seizure when they caused their detentions at Denver CARES.

311.   On September 23, 2017, Defendants Benton and Portillo caused Ms. Midgett's detention at Denver CARES when, without probable cause to believe she was a danger to herself or others, Defendants Benton and Portillo approved Ms. Midgett's service plan and thereby effectuated her admission to detox.

312.   Between September 23 and 24, 2017, Defendant Walston caused Ms. Midgett's continued detention at Denver CARES when, without probable cause to believe Ms. Midgett was either intoxicated or a danger to herself or others, Defendant Walston required Ms. Midgett to submit to an exit interview before she would be released from Denver CARES.

313.    Ms. Midgett is entitled to compensatory and punitive damages from Defendants Benton, Portillo, and Walston for their conduct in causing Ms. Midgett's unlawful detention at Denver CARES.

314.    On July 4, 2017, Defendant Doe #1 caused Mr. Loeslein's detention at Denver CARES, when, without probable cause to believe that he was a danger to himself or others, Defendant John Doe #1 approved Mr. Loeslein's service plan and thereby effectuated his admission to detox.

315.    On July 4, 2017, Defendant Doe #2 caused Mr. Loeslein's continued detention at Denver CARES when, without probable cause to believe Mr. Loeslein was either intoxicated or a danger to himself or others, Defendant Doe #2 blocked Mr. Loeslein's release from detox even though a nurse had approved it.

316.    On July 4, 2017, Defendant Mainardi caused Mr. Loeslein's continued detention at Denver CARES when, without probable cause to believe Mr. Loeslein was either intoxicated or a danger to himself or others, Defendant Mainardi required Mr. Loeslein to submit to an exit interview before he would be released from Denver CARES.

317.    Mr. Loeslein is entitled to compensatory and punitive damages from Defendants Doe #1, Doe #2, and Mainardi for their conduct in causing Mr. Loeslein's unlawful detention at Denver CARES.

318.    On June 9, 2018, Defendants Portillo and Benton caused Ms. Koedel's detention at Denver CARES when, without probable cause to believe that she was a danger to herself or others, Defendants Portillo and Benton approved Ms. Koedel's service plan and thereby effectuated her admission to detox.

319.    Defendant Portillo additionally caused Ms. Koedel's unlawful detention at Denver CARES when, on June 9, 2018, she authorized Ms. Koedel's detention in a quiet room even though there was no probable cause to believe Ms. Koedel was a danger to herself or others.

320.    On June 9, 2018, Defendant Asten caused Ms. Koedel's continued detention at Denver CARES when, without probable cause to believe Ms. Koedel was either intoxicated or a danger to herself or others, Defendant Asten requied Ms. Koedel to submit to an exit interview before she would be released from Denver CARES.

321.    Ms. Koedel is entitled to compensatory and punitive damages from Defendants Portillo, Benton, and Asten for their conduct in causing her unlawful detention at Denver CARES.

322.    On August 11, 2018, Defendants Doe #3 and Doe #4 caused Ms. Seith to be unlawfully seized when, without probable cause to believe she was clearly a danger to herself or others, they took her into custody.

323.    On August 11, 2018, Defendants Doe #5 and Doe #6 caused Ms. Seith's unlawful detention at Denver CARES when, without probable cause to believe that she was a danger to herself or others, Defendants Doe #5 and Doe #6 approved Ms. Seith's service plan and thereby effectuated her admission to detox.

324.    Defendants Portillo and Benton further caused Ms. Seith's unlawful detention at Denver CARES when, on August 11, 2018, they authorized Ms. Seith's detention in a quiet room even though there was no probable cause to believe Ms. Seith was a danger to herself or others.

325.    On August 11, 2018, Defendant Jenkins caused Ms. Seith's continued detention at Denver CARES when, without probable cause to believe Ms. Seith was either intoxicated or a

danger to herself or others, Defendant Jenkins required Ms. Seith to submit to an exit interview before she would be released from Denver CARES.

326.     Ms. Seith is entitled to compensatory and punitive damages from Defendants Doe #3, Doe #4, Doe #5, Doe #6, Portillo, Benton, and Jenkins for their conduct in causing Ms. Seith's unlawful detention at Denver CARES.

327.     On February 27, 2018, Defendants Rose and Doe #7 caused Mr. Stecker's detention at Denver CARES when, without probable cause to believe he was either intoxicated or clearly a danger to himself or others, they approved Mr. Stecker's service plan and thereby effectuated his admission to detox.

328.     On February 27, 2018, Defendant Garner caused Mr. Stecker's continued detention at Denver CARES when, without probable cause to believe he was either intoxicated or clearly a danger to himself or others, she required Mr. Stecker to submit to an exit interview before he would be released from Denver CARES.

329.     Mr. Stecker is entitled to compensatory and punitive damages from Defendants Rose, Doe #7, and Garner for their conduct in causing his unlawful detention at Denver CARES.

### CLAIM TWO – Violation of Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution

### (All Plaintiffs Against All Defendants)

330.     Plaintiffs hereby incorporate paragraphs 1-329, above.

331.     Each Defendant's conduct in detaining non-consenting individuals for purported detoxification services without probable cause to believe that those individuals were both intoxicated and clearly a danger to themselves or others is not rationally related to a legitimate

governmental purpose and is excessive in relation to any potentially implicated legitimate governmental purpose.

332.    The Colorado legislature has determined that there is a legitimate governmental interest in permitting the temporary detention of intoxicated individuals who are clearly a danger to themselves or others. § 27-81-111, C.R.S. This Court's Fourth Amendment jurisprudence acknowledges the same.

333.    By exclusion, the legislature and the courts have declined to recognize a legitimate governmental purpose for detentions of individuals who are not both intoxicated and clearly a danger to themselves or others.

334.    Denver CARES' policy and custom of detaining people without regard for whether they are both intoxicated and clearly a danger to themselves or others, and justifying those detentions as voluntary, bears no rational relationship to the government's legitimate interest in detaining intoxicated and dangerous individuals.

335.    In the alternative, Denver CARES' policy and custom of detaining people without regard for whether they are both intoxicated and clearly a danger to themselves or others, and justifying those detentions as voluntary, shocks the conscience.

336.    Denver CARES' policy and custom of detaining people without regard for whether they are both intoxicated and clearly a danger to themselves or others, and justifying those detentions as voluntary, was the moving force behind Plaintiffs' detentions at Denver CARES detox.

337.    Thus, Plaintiffs are entitled to compensatory damages from Denver CARES for violation of their Fourteenth Amendment substantive due process rights.

338.    Defendants Gabow, Vincent, and Dilag are responsible for Denver CARES' written policy and informal custom of detaining people who are not both intoxicated and clearly a danger to themselves or others. Thus, they are responsible for implementing a policy and custom of severely restricting individuals' liberty without any rational relationship to a legitimate governmental interest.

339.    In the alternative, Defendants Gabow, Vincent, and Dilag are responsible for a policy and custom that shocks the conscience.

340.    Defendants Gabow, Vincent, and Dilag, in writing and implementing written policies that permit and encourage detentions of people who are not both intoxicated and clearly a danger to themselves or others, are responsible for Plaintiffs' detentions at Denver CARES.

341.    Thus, Plaintiffs are entitled to compensatory and punitive damages from Defendants Gabow, Vincent, and Dilag are liable to Plaintiffs for violation of their Fourteenth Amendment substantive due process rights.

342.    On September 23, 2017, Defendants Benton and Portillo caused Ms. Midgett's detention at Denver CARES when, without probable cause to believe she was a danger to herself or others, Defendants Benton and Portillo approved Ms. Midgett's service plan and thereby effectuated her admission to detox.

343.    Between September 23 and 24, 2017, Defendant Walston caused Ms. Midgett's continued detention at Denver CARES when, without probable cause to believe Ms. Midgett was either intoxicated or a danger to herself or others, Defendant Walston required Ms. Midgett to submit to an exit interview before she would be released from Denver CARES.

344.     Defendants Benton, Portillo, and Walston's conduct was not rationally related to any legitimate governmental interest. In the alternative, Defendants Benton, Portillo, and Walston's conduct shocks the conscience.

345.     Ms. Midgett is entitled to compensatory and punitive damages from Defendants Benton, Portillo, and Walston for their conduct in causing Ms. Midgett's unlawful detention at Denver CARES.

346.     On July 4, 2017, Defendant Doe #1 caused Mr. Loeslein's detention at Denver CARES, when, without probable cause to believe that he was a danger to himself or others, Defendant John Doe #1 approved Mr. Loeslein's service plan and thereby effectuated his admission to detox.

347.     On July 4, 2017, Defendant Doe #2 caused Mr. Loeslein's continued detention at Denver CARES when, without probable cause to believe Mr. Loeslein was either intoxicated or a danger to himself or others, Defendant Doe #2 blocked Mr. Loeslein's release from detox even though a nurse had approved it.

348.     On July 4, 2017, Defendant Mainardi caused Mr. Loeslein's continued detention at Denver CARES when, without probable cause to believe Mr. Loeslein was either intoxicated or a danger to himself or others, Defendant Mainardi required Mr. Loeslein to submit to an exit interview before he would be released from Denver CARES.

349.     Defendants Doe #1, Doe #2, and Mainardi's conduct was not rationally related to any legitimate governmental interest. In the alternative, Defendants Doe #1, Doe #2, and Mainardi's conduct shocks the conscience.

350.    Mr. Loeslein is entitled to compensatory and punitive damages from Defendants Doe #1, Doe #2, and Mainardi for their conduct in causing Mr. Loeslein's unlawful detention at Denver CARES.

351.    On June 9, 2018, Defendants Portillo and Benton caused Ms. Koedel's detention at Denver CARES when, without probable cause to believe that she was a danger to herself or others, Defendants Portillo and Benton approved Ms. Koedel's service plan and thereby effectuated her admission to detox.

352.    Defendant Portillo additionally caused Ms. Koedel's unlawful detention at Denver CARES when, on June 9, 2018, she authorized Ms. Koedel's detention in a quiet room even though there was no probable cause to believe Ms. Koedel was a danger to herself or others.

353.    On June 9, 2018, Defendant Asten caused Ms. Koedel's continued detention at Denver CARES when, without probable cause to believe Ms. Koedel was either intoxicated or a danger to herself or others, Defendant Asten requied Ms. Koedel to submit to an exit interview before she would be released from Denver CARES.

354.    Defendants Portillo, Benton, and Asten's conduct was not rationally related to any legitimate governmental interest. In the alternative, Defendants Portillo, Benton, and Asten's conduct shocks the conscience.

355.    Ms. Koedel is entitled to compensatory and punitive damages from Defendants Portillo, Benton, and Asten for their conduct in causing her unlawful detention at Denver CARES.

356.    On August 11, 2018, Defendants Doe #3 and Doe #4 caused Ms. Seith to be unlawfully seized when, without probable cause to believe she was clearly a danger to herself or others, they took her into custody.

357.    On August 11, 2018, Defendants Doe #5 and Doe #6 caused Ms. Seith's unlawful detention at Denver CARES when, without probable cause to believe that she was a danger to herself or others, Defendants Doe #5 and Doe #6 approved Ms. Seith's service plan and thereby effectuated her admission to detox.

358.    Defendants Portillo and Benton further caused Ms. Seith's unlawful detention at Denver CARES when, on August 11, 2018, they authorized Ms. Seith's detention in a quiet room even though there was no probable cause to believe Ms. Seith was a danger to herself or others.

359.    On August 11, 2018, Defendant Jenkins caused Ms. Seith's continued detention at Denver CARES when, without probable cause to believe Ms. Seith was either intoxicated or a danger to herself or others, Defendant Jenkins required Ms. Seith to submit to an exit interview before she would be released from Denver CARES.

360.    Defendants Doe #3, Doe #4, Doe #5, Doe #6, Portillo, Benton, and Jenkins' conduct was not rationally related to any legitimate governmental interest. In the alternative, Defendants Doe #3, Doe #4, Doe #5, Doe #6, Portillo, Benton, and Jenkins' conduct shocks the conscience.

361.    Ms. Seith is entitled to compensatory and punitive damages from Defendants Doe #3, Doe #4, Doe #5, Doe #6, Portillo, Benton, and Jenkins for their conduct in causing Ms. Seith's unlawful detention at Denver CARES.

362.    On February 27, 2018, Defendants Rose and Doe #7 caused Mr. Stecker's detention at Denver CARES when, without probable cause to believe he was either intoxicated or clearly a danger to himself or others, they approved Mr. Stecker's service plan and thereby effectuated his admission to detox.

363.    On February 27, 2018, Defendant Garner caused Mr. Stecker's continued detention at Denver CARES when, without probable cause to believe he was either intoxicated or clearly a danger to himself or others, she required Mr. Stecker to submit to an exit interview before he would be released from Denver CARES.

364.    Defendants Rose, Doe #7, and Garner's conduct was not rationally related to any legitimate governmental interest. In the alternative, Defendants Rose, Doe #7, and Garner's conduct shocks the conscience.

365.    Mr. Stecker is entitled to compensatory and punitive damages from Defendants Rose, Doe #7, and Garner for their conduct in causing his unlawful detention at Denver CARES.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Leigh Ann Midgett, Matthew Loeslein, Kellie Koedel, Andrea Seith, and Benjamin Stecker pray for judgment in their favor and against Defendants as follows:

a.  Nominal, compensatory, and punitive damages in amounts to be determined by the jury;

b.  Reasonable attorneys' fees and expenses, expert witness fees, and the costs of suit herein;

c.  Interest, statutory and moratory, allowed by law;

d.  An order prohibiting Denver CARES from causing individuals' custody and detention at Denver CARES in the future, where those detentions are effectuated without probable cause to believe that they are clearly intoxicated and a danger to themselves or others; and

e.  Such other and further relief as the court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury as to all issues so triable.

Dated this 3rd day of July, 2019.

**LEVIN SITCOFF PC**

*s/ Elisabeth L. Owen*
Bradley A. Levin
Elisabeth L. Owen
Elizabeth A. Walker
1512 Larimer St., Suite 650
Denver, CO 80202
303-575-9390
bal@levinsitcoff.com
elo@levinsitcoff.com
eaw@levinsitcoff.com